Hon. EUGENE B. GARY, Chief Justice.
Hon. C. A. WOODS, Associate Justice.
Hon. D. E. HYDRICK, Associate Justice.
Hon. R. C. WATTS, Associate Justice.
Hon. T. B. FRASER, Associate Justice.

---

## 8340

### WATSON v. VIRGINIA-CAROLINA LUMBER CO.

CONTRACTS.—Under the terms of the contract for the repurchase of certain stock that it should bear its proportion of loss, if any, from the date of the contract to date of purchase; the increase in the value of the corporate plant for the time should be stated as a credit; the contract providing that this common stock should participate with the preferred stock in preferred dividends, its proportion of dividends so paid should not be charged against it; nor should expense amounts not definitely proved be so charged; nor the expense of repairing the plant; nor its share of loss on open accounts not definitely shown to have occurred in that time; nor alleged loss on timber deals found not to exist in fact.

Before SHIPP, J., Sumter, July, 1911. Affirmed.

Action by K. E. Watson against Virginia-Carolina Lumber Company and Sumter Lumber Company. The decree on Circuit is:

"This was an action brought by the plaintiff to require the defendant, Virginia-Carolina Lumber Company, to comply with the terms of a certain contract, between it and the plaintiff, dated September 1, 1909. The defendants all answered, and the defendant, Virginia-Carolina Lumber Company, denied that it had obligated itself by said contract to purchase the sixty-six shares of stock therein mentioned, and alleged that the Sumter Lumber Company had lost money between the periods, September 1, 1909, and May 31, 1910, in such an amount that the plaintiff's proportionate part of said loss exceeded the amount claimed by her.

"The cause was referred to the master for Sumter county to take and report the testimony. The testimony was taken by the master, except that taken *de bene esse,* all of which was reported to the Court.

"The cause came on to be heard by me at the Summer term of the Court of Common Pleas for the county of Sumter. All of the testimony and exhibits were read, and the cause was fully argued on both sides.

"I agree with the attorneys for the defendants, who stated during the argument that practically the only question before the Court was, whether the Sumter Lumber Company had lost or made money between the periods above stated. The defendants submitted a statement made by Mr. Charles A. Peple, an expert accountant, which statement upon its face shows a loss between such periods of six thousand five hundred thirty-six and 61-100 dollars.

"It appears from the evidence that when C. G. Watson took charge of the Sumter Lumber Company, as its manager, that the real estate, upon which the plant of the Sumter Lumber Company is located was being carried on said books at the value of three thousand five hundred dollars. It further appears from the evidence that when said books were turned over to the expert accountant after the close of Mr. Watson's administration, that said real estate had been

put down at ten thousand dollars, an increase of six thousand five hundred dollars.

"It further appears that this fact was called to the attention of Mr. Richard T. Yates, the president of said company, and this item was changed and carried back and the real estate, instead of being carried at the beginning of Mr. Watson's administration at three thousand five hundred dollars, was changed to ten thousand dollars. The evidence shows that this real estate gradually increased in value from the time it was bought until Mr. Watson ceased to be manager of Sumter Lumber Company, and that said increase continued in about the same proportion for the entire time. This real estate was purchased by the Sumter Lumber Company the last of February in the year 1907, and had been owned by them two years and six months before the beginning of Mr. Watson's administration, and this administration continued for a period of nine months. Accepting Mr. Yates' statement that the real estate had increased in value in the sum of six thousand five hundred dollars during the two years and six months, and accepting the statement of their witness, Mr. McLaurin, that the same ratio of increase continued during Mr. Watson's administration, I find that the increase in the value of said real estate during the nine months of Mr. Watson's administration would be about nineteen hundred forty-nine and 94-100 dollars. This increase should have appeared in the inventory of the balance sheets introduced in evidence as a credit, and this would have reduced the loss during said period by said amount. The apparent loss of six thousand five hundred and thirty-six and 61-100 dollars reduced by this amount, would leave an apparent loss of four thousand five hundred eighty-six and 67-100 dollars.

"Under the contract between the plaintiff and Virginia-Carolina Lumber Company forty-one shares of stock therein referred to should bear their proportionate share of this loss. The evidence shows that there were four hundred shares of

stock of the Sumter Lumber Company and the proportionate share of the said forty-one shares would be 41-100 of the above mentioned sum. Forty-one four-hundredths of $4,586.67 amounts to $470.13, which would be the proportionate share which Mrs. Watson should bear of said loss. In addition to the loss which appears from the statements introduced in evidence, the Virginia-Carolina Lumber Company endeavors to have the following items charged as an additional loss during the period of Mr. Watson's administration:

"9-12 of 8 per cent. of $20,000 preferred stock

| | | |
|---|---:|---:|
| of Sumter Lumber Company | $1,200 | 00 |
| Expense inventory | 208 | 50 |
| Depreciation in plant | 3,945 | 00· |
| Loss on open accounts | 107 | 49 |
| Loss on Jackson timber deal | 5,000 | 00 |

"This defendant also has attempted to make Mrs. Watson responsible for what it alleges to have lost upon some timber deal in Virginia. I find from the evidence that at the time of the purchase by Mrs. Watson of the sixty-six shares of stock of the Sumter Lumber Company, that the Virginia-Carolina Lumber Company was the owner of all of the preferred stock and this is the stock upon which they wish to charge Mrs. Watson with dividends. I find from the instrument, increasing the capital stock of the Sumter Lumber Company, that the eight per cent. dividend should be paid out of the net profits of the corporation, and there is no provision for paying said dividend out of any other sum before the final liquidation of the company. The contract under which this action was brought, provides that the forty-one shares of common stock sold to Mrs. Watson, should participate in any net profits which said company might realize during the term of said contract and that it should likewise bear its proportion of any loss in case said company should lose money during the continuance of said contract.

"It appearing from the evidence that the company realized no net profit during this period, and it appearing from the contract between the Virginia-Carolina Lumber Company and Mrs. K. E. Watson, that the said company who owned all of said stock agreed to allow the said forty-one shares to participate in any profits, and to that extent stand upon an equal footing with the preferred stock, I do not think that the said company can now be permitted to claim a dividend and charge the same against Mrs. Watson's stock. I find that this was not contemplated by the parties when the contract was entered into. In addition to this, I find as a further bar to this claim, the fact that according to the terms of the instrument increasing the capital stock of the Sumter Lumber Company, that in case there should be no net profits, then the eight per cent. dividends upon the preferred stock would be deferred until there were net profits sufficient to pay the same, and in case there should never be such net profits, then the payment should be deferred until final liquidation, and that it then should be paid from the proceeds of said liquidation. Therefore, if Mrs. Watson were now required to bear the proportion of said dividends which her stock represents, the company in subsequent years might realize sufficient net profits to pay all of these dividends, and Mrs. Watson would have sustained an injustice, and further, this would amount to paying said dividends at this time from the capital stock held by Mrs. Watson when the instrument above referred to provides that the proceeds of the capital stock shall only be accountable for said dividends after final liquidation. Before this time arrives all of said dividends may be paid from the net earnings of the company.

"I, therefore, hold that this item of twelve hundred dollars is not a proper charge as a loss during Mr. Watson's administration.

"The next loss which the defendant seeks to charge up in addition to the loss shown by the statement is

the item of expense inventory, amounting to $208.50.
I find from the testimony of Mr. Peple that there
appears upon the books of the Sumter Lumber Company
an asset of one thousand two hundred and fifty-one dollars
under the caption of expense inventory. Mr. Peple stated
that this was doubtless made up of various items, such as
taxes, insurance, interest, etc., which had not yet been
expended, and he, therefore, omitted it from his loss column
in the final settlement of May 31, 1910. The attorney for
the defendant sought to ascertain what proportion of this
amount should have been charged into the loss column at
that time. The testimony of Mr. Peple upon this point is
not sufficiently definite to warrant me in charging $208.50 as
a loss during this period. It was incumbent upon the
defendant to make an accounting and show some definite
loss and I do not feel warranted in charging against the
plaintiff any loss founded upon surmise or conjecture. I
refuse to allow this item as a loss during Mr. Watson's
administration.

"The next item sought to be charged up as a loss, is depre-
ciation in plant account, three thousand nine hundred and
forty-five dollars.

"The testimony shows that during Mr. Watson's term,
there were expended in improvements and repairs about
fifteen hundred dollars and that this amount was charged
to the expense account, which is a branch of the loss
account. All the witnesses who testified upon this question
said that the Sumter Lumber Company had never before
charged up a depreciation upon the plant account, and I find
as a matter of fact that such a charge was not in the contem-
plation of Mrs. Watson and the Virginia-Carolina Lumber
Company when their contract was intered into. I do not
think it would be just to charge as a loss the sum of fifteen
hundred dollars, expended in improving the plant, and also
charge ten per cent. upon the value of the plant as deprecia-
tion, which would also amount to a direct loss. This had

not been the custom of the company, it had never been done
before, it had not been charged up by the bookkeeper who
kept the books for the company at the time Mr. Watson
ceased to be manager, and I do not believe that Mrs. Wat-
son ever agreed that the forty-one shares of stock should
bear any part in such a loss, in fact the company would
be under the necessity of actually earning three thousand
nine hundred and forty-five dollars in the operation of its
plant in order to come out even at the end of the year and
leave no profits in which the forty-one shares could partici-
pate, if such a charge were permitted. I find from the
testimony that most of the improvements making up the
sum of fifteen hundred dollars which I have allowed as a
charge in the loss account, were improvements made upon
the plant just a few months before Mr. Watson's adminis-
tration ceased, and that they left the plant in better condi-
tion than it was on September 1, 1909, and instead of the
plant depreciating in value during his administration, it
actually increased, and I, therefore, refuse to allow this
item as a loss during the term of Mr. Watson's adminis-
tration.

"The next item sought to be charged up as an additional
loss, is loss of open accounts, $107.49.

"The testimony of Mr. Yates shows that this amount is
made up of several items from various individual accounts,
and he could not tell which of these accounts were made
during Mr. Watson's administration. Of course, they could
not be chargeable against Mrs. Watson unless they were
incurred during the continuation of her contract, unless
there was definite evidence that for some other reasons they
should be so charged.

"In the absence of such testimony, I must refuse to allow
this item.

"The next and the last additional item sought to be
charged up as a loss, is the loss on the Jackson timber,
alleged to be five thousand dollars. I find as a matter of

fact that there was no such loss properly chargeable during this period. There are numerous reasons for my conclusion upon this matter, but it should be sufficient only to enumerate the following:

. "The plaintiff contends that the Jackson timber deal was in reality only a method on the part of the Sumter Lumber Company of getting notes from Mr. Jackson upon which to raise some money and that these were simply accommodation notes.

"The defendants contend that the sale to Mr. Jackson and repurchase were *bona fide*. In order to arrive at a just conclusion upon this matter, it is well to revert to the original purchase of this timber by the Sumter Lumber Company. Mr. Yates testified that the company had paid thirteen thousand five hundred dollars for this timber, when it originally bought the same. I find, as a matter of fact, that it paid not over three thousand five hundred dollars for the same, and this was a fair market price for it. Mr. Yates testified that he had some claim against Mr. McLaurin which he estimated at ten thousand dollars. There was no proof of the claim in any amount, and even if there had been, it could not increase the value of the timber which was purchased with the money of the Sumter Lumber Company, and if any loss was sustained in this timber transaction, it was sustained at the time McLaurin made the purchase for the Sumter Lumber Company and when the Sumter Lumber Company dropped this claim against McLaurin. As it appears from the testimony that the Sumter Lumber Company paid all the money that was paid for these several tracts of timber, and this did not exceed three thousand five hundred dollars, and the consideration for the McLaurin claim was a few day's service of McLaurin in negotiating the purchase of the timber referred to, I assume that the Sumter Lumber Company could not have had much faith in its claim of ten thousand dollars against McLaurin, if it was willing to settle same for a few days' services of

Mr. McLaurin in negotiating the purchase of said timber. The timber, therefore, having cost only thirty-five hundred dollars, or thereabouts, there was nothing to show that it was worth anything like eleven thousand dollars at the time of the contract with Mr. Jackson, and in fact, subsequent events have shown that it was worth nothing like said amount. These facts, together with the testimony of Mr. Jackson, lead me to the conclusion that there was never a *bona fide* sale from the Sumter Lumber Company to Mr. Jackson, but that this transaction was primarily for the purpose of securing Mr. Jackson's notes upon which to negotiate a loan for a much larger amount than they would otherwise have been able to secure on this timber.

"Even if I had not arrived at the conclusion as above set out, I would still decline to admit this item as a loss because the contract or timber deed between the Sumter Lumber Company and Mr. Jackson, provides that the notes for eleven thousand dollars were to be paid in the following manner: That is to say, the Sumter Lumber Company should deduct two dollars per thousand feet for the timber manufactured at their plant by Mr. Jackson from this timber, and it appears from said contract that this was the only manner in which Mr. Jackson as between these parties could be compelled to pay the notes. In the contract, the Sumter Lumber Company also guaranteed that there were four million five hundred thousand feet of said timber. Upon this guarantee alone, which was made before the contract with Mrs. Watson, the Sumter Lumber Company made itself liable at the rate of two dollars per thousand feet for any shortage in said timber falling below four million five hundred thousand feet.

"Mr. Yates testified that the company got all the timber which Mr. Jackson cut under this contract and that it amounted to one million six hundred thousand feet. This would have paid three thousand two hundred dollars on the notes, and Mr. Yates further testified that they took

back all the balance of said timber on said tracts of land, but that it was still upon the land, and they had lost this balance by reason of Mr. Watson's negligence in failing to cut and remove this timber before the expiration of the contracts. So far as this contention is concerned, I find from the testimony that Mr. Watson endeavored to have Mr. Yates locate mills upon the said tracts or allow him to do so for the cutting of this timber, and the testimony of their witnesses show that this was the only practicable means of removing the same. I find that Mr. Yates refused to allow this to be done, and even required Mr. Watson to cancel an agreement which he had made for the purchase of a mill outfit to cut this timber. Of course, if a loss had actually occurred from this source during Mr. Watson's administration, it should be charged up regardless of who was responsible for the same, but I find as a matter of fact, that the contracts upon this timber did not expire until, in the case of the Abbott contract, the fall of 1910, and in the case of the other contracts, the summer of 1911, and the Sumter Lumber Company had ample time to cut and remove this timber after Mr. Watson ceased to be manager, and Mr. Yates testified that they were still cutting the short timber from some of these tracts. I, therefore, find that if there was any loss upon this timber, it occurred after Mr. Watson's administration.

"The attorney for the defendant argued that in all events the Sumter Lumber Company actually paid seven thousand seven hundred sixty-six and 14-100 dollars for this timber when they took the same back from Mr. Jackson and assumed liability for the notes which Mr. Jackson had given in payment therefor. It should be remembered that the company had gotten all of the timber that Mr. Jackson cut from the land and when they cancelled the contract it took back the remaining timber standing upon said tract, and having guaranteed the quantity sold, they made themselves liable at the time of entering into that contract for any

shortage in the quantity of timber sold, and if there was a shortage, then by assuming to pay the balance upon the notes, they were not assuming a new liability, but simply recognizing one which had attached to them from the beginning. This, however, would not show any actual loss in this timber transaction, because the timber having originally cost less than three thousand five hundred dollars, it is very clear from the testimony that the Sumter Lumber Company has received back a great deal more than this amount from said timber.

"So far as the contention of the defendants with respect to the loss upon the timber deal with the Danville Lumber Company is concerned, I find that they have failed both to show any loss in this transaction and to connect Mrs. Watson with the same. The Virginia-Carolina Lumber Company has not made any showing sufficient to enable the Court to say that there has been a loss upon this timber.

"I find from the evidence, that the timber was gone over before the purchase by Mr. Yates and his estimator, both of whom represented the Virginia-Carolina Lumber Company, and they both appeared to be timber men of equal experience with Mr. Watson, and the Virginia-Carolina Lumber Company in the purchase of said timber did not rely upon the estimate of Mr. Watson, as is shown by the evidence, and especially in the correspondence of Mr. Yates to Mr. Watson.

"I further find that there is no evidence of any representation made by Mr. Watson which would amount to a guarantee, and even if there had been, there is no evidence which would make Mrs. Watson responsible in law for such representations, and this claim cannot be allowed as a loss in this accounting.

"In so far as the claim of the defendants is concerned that the Sumter Lumber Company lost large sums of money through the negligence of Mr. Watson, I hold from the terms of the contract, that Mrs. Watson was only to be

charged with her proportionate share of the loss actually sustained without regard to the negligence or faithfulness of any employee. Besides, I find as a matter of fact, that there was no negligence shown on the part of Mr. Watson as manager of the Sumter Lumber Company.

"Having reached the conclusions above stated, I hold, as a matter of law, that the plaintiff is entitled to have the defendant, Virginia-Carolina Lumber Company, perform its contract, and repurchase said sixty-six shares of stock, paying for twenty-five shares of the same the sum of twenty-five hundred dollars and for forty-one shares of the same the sum of forty-one hundred dollars, less four hundred seventy dollars and thirteen cents, and in settling for same the defendant shall have the right to cancel as part payment of these amounts, the note for four thousand one hundred dollars, without interest, which would leave the said defendant indebted to the plaintiff in the sum of two thousand and twenty-nine dollars and eighty-seven cents, with interest thereon from the first day of June, 1910.

"It is, therefore, ordered, adjudged and decreed that the plaintiff have judgment against the defendant, Virginia-Carolina Lumber Company, in the sum of two thousand and twenty-nine dollars and eighty-seven cents, together with interest upon said amount from June 1, 1910, at seven per centum, together with the costs of this action, and that upon payment of said judgment, the said sixty-six shares of stock shall become the property of the Virginia-Carolina Lumber Company, and the proper officers of the Sumter Lumber Company is hereby authorized and directed to make the necessary and usual transfer of said stock at such time."

From this decree both defendants appeal.

*Messrs. Lee & Moise,* for defendants, cite: *In construing contracts all parts should be considered:* 9 Cyc. 579; 14 S. C. 162; 2 Bail. 55; 84 S. C. 148. *Preferred stock cre-*

*ates a definite liability:* 73 Am. St. R. 238; 1 Id. 330; 78 Fed. 664; 86 Fed. 929; 10 Cyc. 568, 574.

*Mr. L. D. Jennings,* contra.

October 11, 1912.   The opinion of the Court was delivered by

MR. JUSTICE WATTS.   For the satisfactory reasons set out by his Honor in the Circuit decree, it is the judgment of this Court that the judgment of the Circuit Court be affirmed.

MR. JUDGE WOODS *did not hear this case.*